IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

YVES EUGENE ADAMS, CESAR REYES,
PAM PHILPOTT, BRANDON PHILPOTT,
Individually and on Behalf of
Those Similarly Situated                                                    PLAINTIFFS

VS.                    Case No. 5:13-cv-05074-PKH

BENTON COUNTY SHERIFF KELLY CRADDUCK,
In His Individual and Official Capacity                                      DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the Plaintiffs' Motion for Final Approval of Class Action Settlement and for Cy Pres Distribution of Unclaimed Funds. (Doc. 67) The matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) for the purpose of making a report and recommendation.

## Background

This action was filed on April 9, 2013 by Plaintiff, Yves Eugene Philpott, a former detainee of the Benton County Jail. (Doc. 1) Plaintiff alleged that on or about April 19, 2012 Sheriff Cradduck executed a contract with Keefe Commissary Network, LLC[1] for the provision of services regarding prepaid debit cards for inmates. (Doc. 1, ¶ 17) Plaintiff further alleged that pursuant to that contract and Defendant's policy, money seized from arrestees and/or inmates was involuntarily placed into "designated accounts," and that fees were involuntarily charged to inmates for the use (or non-use) of the prepaid debit cards. (Doc. 1, ¶ 19) Plaintiff, individually and on behalf of those similarly situated, asserted civil rights claims under 42 U.S.C. § 1983 (Doc. 1, ¶¶ 29 - 33) and 42

---

[1] Keefe Commissary Network, LLC was conditionally dismissed without prejudice on November 17, 2016. (Doc. 64)

-1-

U.S.C. § 1985(3) (Doc. 1, ¶¶ 34 - 39), and a state law tort claim of conversion (Doc. 1, ¶¶ 40 - 44). Plaintiff and the class members sought compensatory damages, punitive damages, attorney's fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief. (Doc. 1, ¶ 45) An Amended Complaint adding Cesar Reyes, Pam Philpott, and Brandon Philpott as Plaintiffs was filed on June 14, 2013. (Doc. 18)

By December 20, 2013, the parties had reached a tentative settlement. (Doc. 37) After two failed attempts to obtain preliminary approval of their class settlement, the Court on November 17, 2016 entered its Opinion and Order Granting Preliminary Approval of Proposed Class Settlement and Class Certification. (Doc. 64)

Plaintiffs filed their Motion for Final Approval of Class Action Settlement and for Cy Pres Distribution of Unclaimed Funds filed on July 16, 2017. (Doc. 67) Defendant filed its response to the motion on July 31, 2017. (Doc. 71) Following referral to the undersigned, a hearing on the motion was held on August 7, 2017.

## Discussion

In order to obtain final approval of the proposed class settlement, the parties must show that the settlement is "fair, reasonable and adequate." *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988), citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). The Court must consider a number of factors in making this determination: (1) the merits of Plaintiffs' case, weighed against the terms of settlement; (2) the Defendant's financial condition; (3) the complexity and expense of further litigation; and, (4) the amount of opposition to the settlement. *Id*. at 607. The single most important factor is a balancing of the strength of Plaintiffs' case against the terms of the settlement. *Id*.

## A. Settlement Approval

### 1. Merits of Plaintiffs' Case, Weighed Against the Terms of Settlement

The merits of Plaintiffs' case, when weighed against the terms of the proposed settlement, support a conclusion that the settlement is fair, reasonable and adequate.

Plaintiffs believe their cause of action for the state law tort of conversion is the most straight-forward. The tort of conversion does not require conscious wrongdoing; the mere intent to exercise control or dominion over another's property is sufficient. *See City Nat. Bank of Fort Smith v. Goodwin*, 301 Ark. 182, 783 S.W.2d 345 (1990) (bank mistakenly exercised dominion over money in customer's accounts). The measure of damages in such an action is the fair market value of the subject property at the time and place of the conversion. *See McQuillan v. Mercedes – Benz Credit Corp.*, 331 Ark. 242, 250, 961 S.W.2d 729, 733 (1998). Here, other than pre-judgment interest, the proposed settlement provides for payment to each class member in the exact amount of the unauthorized debit card fees assessed on each member's debit card account, so the settlement monies represent the fair market value of the monies that were allegedly converted.

Plaintiffs concede the overall strength of their case weakens when their federal law claims are considered. The weakness of Plaintiffs' § 1983 claim is due to an Eighth Circuit Court of Appeals' decision issued after the filing of Plaintiffs' complaint in April, 2013. In *Mickelson v. County of Ramsey*, 823 F.3d 918 (8th Cir. 2016), *cert. denied*, – U.S. –, 137 S.Ct. 1578, 197 L.Ed.2d 735 (April 17, 2017), the Court was faced with a similar set of facts. The Court commented that due process protections do not attach to all property, and that there exists "a *de minimus* level of imposition with which the Constitution is not concerned." *Id*. at 930 (internal citations omitted). The Court concluded that "the distinctions between cash and the [debit] cards are not constitutionally

significant such that they trigger due process protections." *Id*. at 931. Noting that the debit card fees may be avoided by the vast majority of arrestees, and that converting the debit card back into cash using an ATM incurred only a one-time fee of $2.75, the Court held that "such a minimal imposition does not trigger constitutional due process protection. ... [t]he potential deprivation is *de minimus*." *Id*. In light of *Mickelson*, the Plaintiffs correctly assess the strength of their § 1983 claim as being "quite low."

While asserting that they could possibly prove the essential elements of their § 1985 claim, Plaintiffs submit that doing so "would be very costly, time consuming and laden with complex issues of law and fact." As a result, they contend a settlement that offers to each class member an amount to which each class member would claim to have been unlawfully seized is "a very reasonable alternative." The undersigned agrees.

The proposed settlement is effectively a 100% pay-out of the class members' compensatory damages. While pre-judgment interest on the claimed compensatory damages is not being paid, the amount of pre-judgment interest owed to each class member would be *de minimus*. Moreover, the settlement paid cash to the class members, and the only real logistical problem in achieving a 100% recovery for the class members has been the difficulty in locating class members (due to their transiency) and whether or not they decide to cash the settlement checks sent to them.

Two mailings of the settlement notice and settlement checks have been made. The initial mailing of 2,180 notices and accompanying settlement checks was made on March 22, 2017. 759 of those initial mailings were returned as undeliverable. (Doc. 66, ¶ (iii)) Through Accurint, the claims administrator was able to obtain alternate addresses for 590 of those 759 returned mailings; and, in addition, the claims administrator was able to locate 26 class members who were incarcerated

in the ADC. (Doc. 66, ¶ (iv)) On June 5, 2017, a second round of mailings was sent to the 616 class members alternative addresses were obtained for. The claims administrator also mailed an additional 27 notices and settlement checks to class members whose forwarding addresses were obtained through the initial mailing. Thus, as of June 5, 2017, the second round of mailings totaled 643. (Doc. 66, ¶ (v)) Of those 643 second mailings, only 95 have been returned as undeliverable. (Doc. 66, ¶ (vii)) At the hearing, counsel for the Defendant informed the Court that cleared settlement checks totaled $4,385.79, representing 448 claimants.

In addition to the monetary benefit to the class, the proposed settlement provides for injunctive relief in that Benton County shall refrain from instituting any debit card programs whereby the cash belonging to any inmate that Benton County takes possession of at booking is returned to the inmate upon release in an amount decreased by debit card fees, unless the inmate consents to the imposition of a debit card fee. (Doc. 60, ¶ 13.2(f))

The merits of the Plaintiffs' claims, weighed against the terms of the proposed settlement, favors final approval of the settlement.

### 2. Defendant's Financial Condition

Benton County is a political subdivision of the State of Arkansas. A.C.A. § 14-14-102. Neither party has presented evidence concerning the financial condition of Benton County, Arkansas. There is no indication that Benton County's financial condition would prevent it from raising the settlement amount or from vigorously litigating the case to trial. As noted above, the proposed settlement is equivalent to what the Plaintiffs could have recovered if the case proceeded to trial and judgment, and payment of the settlement amount has been made in cash to the class members. This factor is neutral. *See Marshall v. Nat'l Football League*, 787 F.3d 502, 512 (8th Cir. 2015) (finding

this factor neutral where defendant was "in good financial standing, which would permit it to adequately pay for its settlement obligations or continue with a spirited defense in the litigation").

### 3. Complexity and Expense of Further Litigation

When the parties initially announced that they had reached a settlement on December 20, 2013, there were several motions pending before the Court: Plaintiffs' Motion to Compel Discovery (Doc. 25), Plaintiffs' Motion to Certify Class (Doc. 30), and Plaintiffs' Motion for Partial Summary Judgment (Doc. 32). All of these motions were withdrawn without prejudice due to the proposed settlement reached by the parties. (Docs. 37, 38) These motions would be renewed and have to be litigated in the absence of settlement approval.

Plaintiffs submit that their claims present issues of "an appreciable degree of complexity." Regarding the conversion claim, Plaintiffs argue that the question of exactly what constitutes an act of conversion under these circumstances would have to be addressed, as would questions concerning the Plaintiffs' ability to avoid the imposition of debit card fees (by immediately withdrawing all the money on the cards upon release) and how to apportion liability between the Defendants. Establishing the *scienter* requirement for the § 1985(3) claim would present challenges in that Plaintiffs would have to prove that the Defendants acted with a purpose to deprive the inmates of their rights, and that they did so with class based animus. The difficult issues of proving intent would force Plaintiffs to rely on circumstantial evidence. Application of equal protection and Fourth Amendment analyses would also require development in the context of Plaintiffs' § 1985(3) claim. Benton County also argues that the affirmative defense of offset would also have to be addressed, and it agrees that there are complex issues involved in the case.

In addition to completion of discovery as contemplated by Plaintiffs' prior Motion to Compel

Discovery (Doc. 25), Plaintiffs' counsel estimated that approximately four depositions would have to be taken to prepare for trial, and that the anticipated expense of further litigation would be $3,000.00 to $4,000.00, exclusive of attorney's fees. Given the overall amount of the Plaintiffs' claimed damages, Benton County's counsel advised that the desire to avoid administrative and attorney's fees to the extent possible was a primary concern motivating Benton County toward settlement. Thus far, according to defense counsel, the cost of administering the proposed settlement has been approximately $8,000.00.

The undersigned views this factor as weighing in favor of settlement approval.

### 4. Opposition to the Settlement

There has been no formal opposition to the settlement. No opt-outs have been received. Counsel for Benton County advised that there was only one informal letter received by the settlement administrator voicing objection to the settlement, but that individual failed to follow through and submit a formal objection to the settlement. Benton County's counsel sees the lack of opposition to the proposed settlement as particularly significant given the make-up of the class, i.e., prisoners, who are, he asserts, generally a litigious group of people.

The undersigned views this factor as weighing in favor of settlement approval.

Considering all of the *Van Horn* factors, the undersigned finds that the settlement is fair, reasonable, and adequate, and final approval of the settlement is recommended.

### B. *Cy Pres* Distribution

"The term '*cy pres*' is derived from the Norman French expression, *cy pres comme possible*, which means 'as near as possible.'" *In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 625 (8th Cir. 2001) (internal citation omitted). In the class action context, it may be appropriate for a

court to use *cy pres* principles to distribute unclaimed funds. In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated. *Id*. at 625-26; *see also Powell v. Geogia-Pacific Corporation*, 119 F.3d 703 (8th Cir. 1997).

The parties' settlement agreement provides that if any of the qualifying damages is unclaimed (by failure to negotiate the settlement checks mailed), "then the Court shall determine the manner in which any unclaimed funds are distributed, upon suggestion by the Parties." (Doc. 60, ¶ 5.5, p. 8) The parties agree that some of the settlement monies will likely be unclaimed. They are not in complete agreement as to what the appropriate *cy pres* distribution of those unclaimed funds should be.

Consistent with the *cy pres* principles discussed at length in *Oetting v. Green Jacobson, P.C. (In re BankAmerica Corp. Sec. Litig.)*, 775 F.3d 1060 (8th Cir. 2015), Plaintiffs suggest that the Benton County Public Defender's Office would be the most appropriate recipient of any unclaimed settlement funds. Plaintiffs were all inmates at the Benton County Jail who had been subjected to the criminal justice process, and they point out that some, "if not a sizeable portion," of the class members utilized public defender services in connection with the offense(s) which led to the incarcerations that gave rise to this class action. Plaintiffs further argue that this case concerns the financial interests of inmates, and that public defender programs exist due to the financial condition of inmates. (Doc. 68, p. 24)

In that participating class members have been compensated in the exact, liquidated amounts of their respective claims, Benton County contends that an additional pro rata distribution to participating class members "would provide a windfall to class members with liquidated-damages

claims that were 100 percent satisfied by the initial distribution." (Doc. 71, p. 2) (Citing *Oetting*, 775 F.3d at 1063-64 (internal citation omitted)). Instead of the Benton County Public Defender's Office, Benton County suggests a better *cy pres* recipient would be: (1) the group of non-participating class members, (2) Benton County (for the benefit of inmates generally, e.g. new bed mats, jumpsuits, etc.), or (3) the Plaintiffs' counsel. (Doc. 71, p. 3)

The undersigned agrees that an additional pro rata distribution to the participating class members would result in a windfall (albeit small) to class members who have already received full compensation for their respective claims. The question concerns to whom, among the suggested recipients, the *cy pres* distribution should be made.

At the hearing held on August 7, 2017, Plaintiffs' counsel candidly stated that he wished he had thought of the suggestion made by Benton County concerning a *cy pres* distribution to the non-participating class members. Recidivism is a sad reality in the criminal justice system. As Benton County points out, some of the non-participating class members will likely return to the Benton County Jail. The suggestion of setting up inmate accounts in each of the non-participating inmates' names, to hold for a defined period of time, in a good one. That method would, to the greatest extent possible, ensure that those non-participating class members who have been damaged by the conduct at issue in this action would receive their liquidated-damages claim payments. The undersigned recommends this approach as the first level of *cy pres* distribution.

For those class members who do not negotiate their settlement checks within two years from the date of issuance, the settlement funds representing their payments should then be placed into accounts at the Benton County Jail in those inmates' names to be held for an additional period of 180 days. At the conclusion of that additional 180-day time period, all unclaimed funds in those inmates'

accounts, along with all remaining unclaimed settlement funds, would be subject to a second *cy pres* distribution.

Plaintiffs' counsel argued at the hearing that any *cy pres* distribution back to Benton County for the benefit of inmates at the Benton County Jail, e.g. new bed mats, jumpsuits, etc., would be providing funds to the county for something the county is already obligated to provide to inmates. It would be, in effect, a reversion of the unclaimed settlement funds to the county. The undersigned cannot recommend such a reversionary distribution. Nor does the undersigned recommend having any unclaimed settlement funds used for Plaintiffs' attorney's fees. The issue of attorney's fees for class counsel should be considered separately from the appropriateness of any *cy pres* distribution.

It is the undersigned's view that the Benton County Public Defender's Office is an appropriate *cy pres* recipient. Many of the class members were probably represented by the Benton County Public Defender. Numerous other inmates who will be incarcerated at the Benton County Jail will benefit from the services of the Benton County Public Defender. Accordingly, at the end of the 180-day time period during which the non-participating class members' funds are held in inmate accounts at the Benton County Jail, all unclaimed funds in those inmates' accounts, along with all other unclaimed settlement funds, should be paid to the Benton County Public Defender's Office for its general use in representing Benton County criminal defendants.

### C. Conclusion

For the reasons discussed above, the undersigned finds that the proposed class action settlement is fair, reasonable, and adequate, and it is recommended that Plaintiffs' Motion for Final Approval of Class Action Settlement and for Cy Pres Distribution of Unclaimed Funds (Doc. 67) be **GRANTED**.

It is further recommended for those non-participating class members who do not negotiate their settlement checks within two years from the date of issuance, that the settlement funds representing their payments then be placed into accounts at the Benton County Jail in those inmates' names to be held for an additional period of 180 days. At the conclusion of that additional 180-day time period, all unclaimed funds in those inmates' accounts, along with all remaining unclaimed settlement funds, should be paid to the Benton County Public Defender's Office for its general use in representing Benton County criminal defendants.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 15th day of August, 2017.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE